## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Brian T. Wainscott, | ) | C/A No.: 1:09-1522-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner of the | ) | |
| Social Security Administration | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff Brian T. Wainscott ("Plaintiff" or "Claimant") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards.

I.      Relevant Background

A.      Procedural History

On January 26, 2005, Plaintiff filed applications for DIB and SSI with an alleged onset date of December 7, 2000. (Tr. 108-12, 632-33). Plaintiff's applications were denied initially and on reconsideration (Tr. 23, 84-88, 91, 97-100). After a hearing on July 2, 2007 (Tr. 23,42-83), an administrative law judge ("ALJ") issued a decision on

August 21, 2007, finding that Plaintiff was not disabled within the meaning of the Act from December 7, 2000, through the date of his decision. *See* Tr. 23-36. On May 6, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 7–9). The decision of the ALJ, therefore, became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1491(2009).

B.    Plaintiff's Background and Medical History

Born April 7, 1972, Plaintiff was 35 years old on the date of the ALJ's decision, making him a younger individual (Tr. 108, 154, 174); 20 C.F.R. § 404.1563(c). Plaintiff alleges disability as of December 7, 2000, when, while working on a staircase hanging fiberboard overhead at the construction site, he fell backwards approximately ten feet while taking a measurement, resulting in injury to his head and back. Tr. 28, 419, 492, 515, 521. Plaintiff completed the eleventh grade and has past relevant work as a construction foreman, a carpenter, a busboy, a heavy equipment operator, and a welder. Tr. 35, 109–28, 137–45, 147, 152, 157–65.

1.    Medical Evidence Prior to Plaintiff's Alleged Onset of Disability.

On April 1, 1982, after Plaintiff began performing poorly in school, Mildred M. Colgan, the school psychologist, performed a Psychological Evaluation on Plaintiff, during which she stated Plaintiff's cooperation and effort were sufficient to conclude that the test results were a valid estimate. On the Weschler Intelligence Scale for Children—Revised, Plaintiff earned a Verbal IQ of 87, a Performance IQ of 96, and a

Full Scale IQ of 91. Plaintiff's school records reflect that he repeated the fourth grade, and he withdrew from school during the eleventh grade. Tr. 205–21.

## 2. Medical Evidence After Plaintiff's Alleged Onset of Disability

Plaintiff was evaluated for a possible concussion at the hospital immediately after the fall. Tr. 515. A CT brain scan showed no evidence of acute injury. Tr. 495, 498, 504, 524. X-rays of the lumbar and thoracic spine were normal. Tr. 498, 505–07, 524. Dr. Richard K. Osenbach stated that Plaintiff had L1-L2 disk bulge status after a 10-foot fall. Tr. 492–93. Plaintiff was alert and oriented on examination and demonstrated fluid speech, had equal and reactive pupils, and followed commands. Tr. 492, 497, 499–500, 523. He was released from the hospital after examination by the physical therapist. Tr. 226, 493, 526, 532. The in-patient physical therapy discharge summary indicated that Plaintiff could walk a fair distance without assistance. Tr. 526. Although Plaintiff did not need assistive devices to ambulate, he was prescribed a cane to use for walking as needed. Tr. 226–27, 493, 526.

On January 15, 2001, Dr. Osenbach performed a follow-up examination of Plaintiff for complaints of low back pain radiating from his right leg with weight-bearing, but not when lying down. Tr. 226–27. Dr. Osenbach observed on examination that Plaintiff was "a healthy-appearing young man who is in no acute distress." Tr. 226. Examination of his lower extremities showed normal bulk and tone and full range of motion and minimal tenderness to palpation in the midline of Plaintiff's lumbar spine. Tr. 227. Dr. Osenbach noted that Plaintiff had back pain on straight leg raising on the right,

and that Plaintiff gave poor effort during the motor examination of his right leg. Tr. 227. Although Plaintiff told Dr. Osenbach he was unable to stand and bear weight and walk (Tr. 226–27), Dr. Osenbach "actually observed [Plaintiff] walking with his walker when he was not aware [Dr. Osenbach was watching] as he was leaving the clinic" (Tr. 227). Dr. Osenbach diagnosed Plaintiff with an acute lumbar strain and noted that no radiographic evidence or results from the sensory examination supported Plaintiff's complaints (Tr. 227).

On January 17, 2001, Plaintiff's lumbar myelogram was normal, but the CT scan of his lumbar spine showed likely disc herniation at L1-L2 with impingement of the L1 nerve root. Tr. 225.

On January 30, 2001, Dr. Osenbach telephone Plaintiff to discuss the results of a myelogram, which showed a small disc herniation at L1–2 eccentric to the left, and that the subjective weakness on the right was not explainable by these findings. Dr Osenbach indicated that surgery would not help Plaintiff's situation. Tr. 223–27.

On March 1, 2001, Dr. Stephen Q. Parker began treating Plaintiff for back pain and numbness diffusely in his right lower extremity. Tr. 417. Dr. Parker felt that Plaintiff had facet joint syndrome and disc disease, and he limited Plaintiff to sedentary duty. *Id.*

On April 9, 2001, Dr. Parker performed a nerve conduction study which showed an abnormal study; evidence of lumbar radiculopathy involving L3 through L5 nerve root; evidence of ongoing nerve damage as well as recovery to some degree being noted

throughout the L3-4/4-5 and L5-S1 nerve distribution, right greater than left; and there appeared to be bilateral involvement.  Tr. 416.

On June 25, 2001, Dr. Parker indicated that he had been prescribing Oxycontin and Percocet for Plaintiff's pain, and he refilled these medications. Tr. 415.  Dr. Parker also stated that Plaintiff had undergone physical therapy, and he recommended facet joint injections for additional pain relief.  He also prescribed Neurontin 200 milligrams to be taken three times daily for Plaintiff's nerve pain.  *Id.*

On April 24, 2001, at Dr. Parker's request, Plaintiff was examined by neurological surgeon Dr. Jose Santiago.  Dr. Santiago felt that Plaintiff's history was consistent with acute lumbar strain associated with a contusion of the conus medullaris. Plaintiff also had findings of degenerative disc with narrowing of the disc space at L1-2 and a disc bulge that was eccentric to the left at that level. Dr. Santiago stated that he could operate but he did not feel that it would help any. Moreover, Dr. Santiago said that he might even need to do a fusion, but he felt that Plaintiff was too young for this option. Dr. Santiago suggested that Plaintiff should go to physical therapy, Plaintiff should wear a thoracolumbar brace or at least a lumbar corset, Plaintiff should take non-steroidal anti-inflammatories, and Plaintiff should have a trial of Neurontin for his persistent sensory polyneuropathy. Tr. 541–45. Dr. Santiago noted Plaintiff was "slightly overweight" and that he could not correlate Plaintiff's subjective complaints with objective testing.  Tr. 543.  Dr. Santiago concluded the tests demonstrated no obvious neural compression and only "non-objective" neurological deficiencies and noted that

Plaintiff's history was "only consistent with acute lumbar strain." Tr. 410, 541. Dr. Santiago noted that the abnormalities presented in the x-rays were not consistent with the clinical picture. Tr. 543. He also noted that Plaintiff was beginning to demonstrate some degree of positive Waddell signs (a group of physical signs that may indicate a non-organic or psychological component to chronic low back pain, or to detect malingering in patients with back pain). Tr. 544. Dr. Santiago reported that he "had a prolonged discussion with the patient . . . and explained his findings. At first he seemed somewhat disappointed in that I was telling him that he does not need surgery." Tr. 544. Dr. Santiago recommended a work hardening program because Plaintiff's complaints were consistent with bruising. Tr. 410, 543–44. Dr. Parker also recommended work hardening because surgery was not an option. Tr. 415.

From May 22, 2001, until June 22, 2001, Plaintiff underwent physical therapy at HealthSouth Rehabilitation Hospital. Tr. 243. At the time of his discharge on August 21, 2001, the therapist, Carla Wood Benton, indicated that Plaintiff's thoracolumbar range of motion forward bending was 75% limited; backward bending and side bending, bilaterally, were 50% limited. *Id.*

On July 5, 2001, Plaintiff received facet joint injections at L2-3 and L3-4. Tr. 230–75.

On July 12, 2001, Plaintiff returned to Dr. Parker and reported that he had had significant pain after the facet joint injections and continued to have severe pain. Tr. 414. Dr. Parker then prescribed MS-Contin for Plaintiff's pain. In addition, Dr. Parker opined

that, "[a]t this particular time, however, he is not able to perform work to any degree at all secondary to his pain complaints and lack of sleep. . . . I think that it is definitely safe to say that he be disabled from six months to a year regarding this particular situation." *Id.*

On July 30, 2001, Dr. Parker indicated that Plaintiff had a formal diagnosis of degenerative disk disease L1, 2, L5-S1. Tr. 413. Dr. Parker also stated that all conservative measures had failed, and he gave Plaintiff a referral to Dr. Rakesh P. Chokshi, an orthopedic surgeon, because Plaintiff continued to report significant pain. *Id.*

On October 8, 2001, Dr. Parker noted that Plaintiff had been rejected as a surgical candidate. Tr. 412.

On November 24, 2001, Dr. Parker performed an Independent Medical Exam at the request of the insurance carrier in Plaintiff's worker's compensation litigation. Tr. 411–12. As part of this examination, Dr. Parker recounted his treatment history with Plaintiff, including Plaintiff's continuing complaints of back pain and right lower extremity numbness with weakness. *Id.* Dr. Parker diagnosed Plaintiff at this time with chronic pain syndrome as related to L1-2 disc bulge on the left; conus contusion; and electrodiagnostic evidence of lumbar nerve root compromise bilaterally, right greater than left. Dr. Parker also felt that Plaintiff's prognosis was poor. Dr. Parker also stated that Plaintiff was an individual with a disability, and Plaintiff was disabled from his job. Dr. Parker further opined that Plaintiff probably would test in the sedentary work category and would need frequent position changes if this could be allowed at his place of employment. Dr. Parker also was pessimistic regarding improvement of Plaintiff's

condition and noted Plaintiff reported "fishing, picking berries, shopping and light duties." Tr. 406–13.

Dr. Chokshi first examined Plaintiff on September 24, 2001, at which time Plaintiff weighed 240 pounds, and he exhibited an intermittently antalgic gait. Dr. Chokshi felt that Plaintiff had been extensively evaluated and that Plaintiff had low back pain with right leg numbness secondary to possible nerve contusion when injured. Dr. Chokshi suggested a repeat EMG/Nerve Conduction Study. Tr. 546–48.

On April 9, 2002, Plaintiff returned to Dr. Parker, who recounted that he had given Plaintiff an "80%"[1] lumbar impairment six months previously. Plaintiff continued to complain of knee and persistent back pain. Tr. 405.

On June 20, 2002, Plaintiff had a lumbar myelogram at McLeod Regional Medical Center, which showed some disc space instability at L1/2 with a left sided eccentric disc protrusion causing mass effect on the thecal sac." Tr. 298. He also had very "mild broad based disc bulges at L3-4, L4-5, and L5-S1 without significant canal and neural foraminal narrowing." Tr. 298–99. Plaintiff also had a lumbar CT with contrast on the same date, which confirmed the findings of the myelogram. Tr. 298–300.

On June 27, 2002, Dr. Parker examined Plaintiff after his myelogram, and Dr. Parker doubled the dose of Plaintiff's OxyContin from 10 mg to 20 mg b.i.d. and

---

[1] Although Plaintiff's counsel cites to this number (and only this number) in the brief, a review of the record reveals it to have clearly been a typographical error in the physician's note, as Dr. Parker's remaining notes reveal only a 6% or 8% impairment rating. Tr. 407–09.

continued his Percocet 7.5 mg for break-through pain. Tr. 404. Plaintiff had a repeat EMG/Nerve Conduction study on July 16, 2002, which was an abnormal study with evidence of lumbar radiculopathy L3 through L5 with evidence of ongoing nerve damage, no evidence of lumbosacral plexopathy, and no evidence of peripheral neuropathy. Dr. Parker stated that this study was slightly worse than the previous study.

On August 14, 2002, Dr. Chokshi reexamined Plaintiff, and after reviewing the repeat myelogram and EMG, Dr. Chokshi thought that Plaintiff showed some worsening on the diagnostic studies. Dr. Chokshi still did not feel that surgery would be beneficial for Plaintiff. Tr. 546.

On September 12, 2002, Plaintiff returned to Dr. Parker with reports that Dr. Chokshi had again rejected him as a surgical candidate. Dr. Parker felt that Plaintiff would need chronic pain management. Further, Dr. Parker concluded that Plaintiff would be unable "to perform his former duties and this raises the question as to whether he is disabled permanently from any job. This question can be best answered by Vocational Rehabilitation evaluation and at such time if they determine he is unable to sustain gainful employment then this should be the determination and I would certainly concur with this." Tr. 401–04.

On January 30, 2003, Plaintiff was seen by Dr. Parker, who indicated that he could only provide Plaintiff with pain management. Dr. Parker noted that Plaintiff had obtained a McLeod Work Recovery Center FC Report dated October 28, 2002, which ranked Plaintiff as modified light work. Dr. Parker noted "[t]his did not meet the requirements of

his present job as a carpenter, which is rated as very heavy work." Dr. Parker requested an FCE evaluation of Plaintiff by Vocational Rehabilitation, if available. Tr. 400.

On February 10, 2003, Plaintiff went to the emergency room at Carolinas Hospital System, chiefly complaining of a head cold and bronchitis and was diagnosed with bronchitis. The ER records showed his employer as HR Allen Construction, but listed Plaintiff's address as that of guarantor. On February 13, 2003, Plaintiff returned to the same emergency room for continued congestion, and he was diagnosed with pneumonia of the right lower lobe. Tr. 308–22.

On October 20, 2003, Plaintiff initiated a new patient check-up with Dr. Benjamin W. Lamb, at which Plaintiff inquired about immunizations for chicken pox and MMR. Plaintiff weighed 258 pounds. Dr. Lamb diagnosed tobacco use disorder and obesity. Tr. 563.

On January 14, 2004, Dr. Parker performed another EMG/Nerve Conduction Study on Plaintiff. He indicated the study was "abnormal," and that there was "still evidence of lumbar radiculopathy, chronic, with increased latency over the last study of July 16, 2002. This which could suggest lower lumbar pathology, even though previous radiographs showed left-sided, not right-sided, pathology. Tr. 395–99.

On February 25, 2004, Dr. Lamb remarked that Plaintiff was having back spasms, and he diagnosed lumbago. Tr. 559–60.

On June 2, 2004, Dr. Lamb performed a consultative examination on Plaintiff. Tr. 379–82. Plaintiff reported he "was previously a foreman of a carpenter crew." Tr. 379.

Plaintiff was put in jail for a probation violation that stemmed from being convicted of defrauding the insurance industry. Tr. 379.[2] Plaintiff reported that he could not work after being injured from the December 2000 fall. Tr. 380. He used a cane, infrequently, when he had severe pain. Tr. 380. His pain was worse in the morning. Tr. 380. He experienced occasional stiffness; increased activity caused throbbing pain in his back and pins and needles down his right leg. Tr. 380. He could stand for an hour and sit for an hour and a half. Tr. 380. He could perform all of his activities of daily living, including occasionally using a vacuum cleaner. Tr. 380. Examination revealed full range of motion of all joints with no swelling. Tr. 381. Neurological exam was normal except for diminished sensation in the right leg to vibration and temperature sensation and supine leg raising on the right at 60 degrees. Tr. 381. A lumbar spine x-ray was unremarkable, showing only potentially mild narrowing at L5-S1. Tr. 383. Dr. Lamb opined the only work Plaintiff could perform would have to allow Plaintiff to change his position each hour. Tr. 381–82. Plaintiff reported that any activity produced throbbing pain in his back with a pins and needles sensation running down his right leg. At the time of the examination, Plaintiff was five feet eleven inches tall and weighed 250 pounds. Dr. Lamb noted that Plaintiff had 5/5 strength bilaterally in his lower extremities, but Plaintiff had pain in his right lower extremity. Plaintiff also exhibited diminished sensation on the right lower extremity to vibratory and temperature sensation in the L5 dermatome. Straight leg raising in the

_____

[2] Dr. Lamb's notes reflect that Plaintiff apparently set his mobile home on fire because he could not pay the bills on it. Tr. 379.

supine position was positive on the right to about 60 degrees and on the left to about 75 degrees. Dr. Lamb diagnosed chronic low back pain with L5 radiculopathy. Dr. Lamb also stated that Plaintiff had undergone numerous evaluations and workups for chronic back pain and there was clear nerve damage on the right side. Moreover, Dr. Lamb felt that there was likely no improvement to be gained by surgical intervention. Furthermore, Dr. Lamb opined that based upon his examination, Plaintiff did "have evidence of nerve root injury and compromises on the right." Dr. Lamb concluded by stating, "[i]t does not appear that he will be able to perform gainful employment unless a position would be found for him that would allow for him to have multiple position changes throughout the day with no more than an hours time in any one position." Tr. 379–83.

On June 22, 2004, Dr. J. Joe Neely completed a Psychological Evaluation on Plaintiff. Tr. 385–87. Plaintiff reported he took pain medication only when he absolutely needed it—about two or three times a week. Tr. 385. Plaintiff reported he performed his own self-help, drove a car, and performed minor chores (e.g., feeding pets). Tr. 385. Dr. Neeley observed that Plaintiff was a well-developed, neatly dressed man who drove himself to the evaluation and interacted in a pleasant and cooperative manner. Tr. 386. He had good fine motor skills, with clear and understandable speech. Tr. 386. He had no difficulty concentrating. Tr. 386. Plaintiff reported that he left school in the eleventh grade due to behavioral difficulties. Plaintiff also told Dr. Neely that he was in remedial math and reading classes, where he performed poorly academically, often leading to his becoming involved with altercations with other students. Dr. Neely noticed during his

evaluation that Plaintiff moved stiffly and with awkwardness to his gait. Plaintiff displayed a very high level of motivation on testing. Dr. Neely indicated that Plaintiff obtained a Verbal IQ of 73, a Performance IQ of 86, and a Full Scale IQ of 77. Dr. Neely also felt that Plaintiff had reading abilities at the eighth grade level and arithmetic skills at the sixth grade level. After testing, Dr. Neeley opined that Plaintiff retained borderline to low-average intellectual abilities. Tr. 386. Dr. Neeley observed that Plaintiff functioned well within his environment and coped well with his physical disabilities. Tr. 386. Dr. Neeley indicated that Plaintiff would be capable of managing money. Tr. 387. Tr. 385–87.

On July 28, 2004, Plaintiff returned to Dr. Lamb and reported going to the emergency room for chest pain and kidney stones. Tr. 556–58.

On January 20, 2005, Plaintiff was treated at Carolinas Hospital System-Lake City for acute thoracic back syndrome. Tr. 593–97.

On January 27, 2005, Dr. Parker noted that Plaintiff continued to have spasms in his lower back. Dr. Parker discontinued Plaintiff's Percocet and prescribed Lorcet 10/650.

On March 9, 2005, Dr. Lamb saw Plaintiff again for complaints of right wrist pain, which Dr. Lamb indicated was deQuervain's tenosynovitis and tendonitis of the wrist. Dr. Lamb prescribed Motrin 600 milligrams and a cock-up wrist splint. Tr. 554–55.

In September 2005, Plaintiff reported to Dr. Parker that his pain had worsened, and Dr. Parker increased the dosage of OxyContin to 60 milligrams every 8 hours. Tr. 393–94.

In October 2005, Dr. Lamb treated Plaintiff for an upper respiratory infection.  Tr. 551-52.

On November 30, 2005, Plaintiff went to Dr. Lamb for acute bronchitis, and Dr. Lamb wrote orders to admit him to the hospital, but he never reported for admission. Tr. 549–55.

On December 1, 2005, Dr. Elizabeth A. Dickinson examine Plaintiff in a one-time consultative examination. She noted that Plaintiff weighed 249 pounds and that Plaintiff's gait and station showed mild right antalgia. Examination showed Plaintiff had 5/5 strength with normal fine and gross motor dexterity, no atrophy; he demonstrated free range of motion in each hip. Tr. 420–23. Dr. Dickenson observed that Plaintiff perceived weakness and instability in his right leg, but examination revealed relatively well-preserved strength. Tr. 422.  Dr. Dickinson felt that Plaintiff had an injury to the lumbar spine with radicular pain syndrome into the right leg. Plaintiff had loss of some pinprick sensation in the distal right lower extremity. She stated that pain was the predominant limiting factor with Plaintiff, and his pain is worsened by any prolonged posture, either sitting or standing, eased only slightly with lying down. She further noted that Plaintiff was prescribed large amounts of daily narcotic medication. Plaintiff also had degenerative joint disease that may be chondromalacia patella on the left. Tr. 420–24.

On December 12, 2005, State Agency Medical Consultant Dr. Mark A. Williams completed a Psychiatric Review Technique that indicated Plaintiff would have moderate difficulties in maintaining concentration, persistence, or pace. Dr. Williams also

completed a Mental Residual Functional Capacity (RFC) Evaluation the same date, in which he opined that Plaintiff would be moderately limited in his ability to understand, remember and carry out detailed instructions and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 433–45, 448–50.

On February 6, 2006, Dr. Stephen Parker indicated that Plaintiff's condition was unchanged as he continued to report severe pain in his low back. In addition, Dr. Parker noted that Plaintiff had a positive Tinel's and a positive Phalen's to the right upper extremity, which suggested carpal tunnel syndrome secondary to median mild neuropathy at or distal to the wrist. Dr. Parker gave Plaintiff a cock-up splint to wear at night or all day.  Tr. 566.

On June 6, 2006, Plaintiff returned to Dr. Parker for continued pain and complaints of limited sleep, usually only four to five hours sleep nightly.  Tr. 565.

On February 26, 2007, Plaintiff reported to Dr. Parker his condition was unchanged, and Dr. Parker transferred Plaintiff's pain management care to First Choice Health Care. Tr. 564.

On March 23, 2007, Plaintiff went to Lake City Community Hospital with complaints of right flank pain for several days.  A CT scan showed bilateral nonobstructing nephrolithiasis with a 4 millimeter obstructing right ureteropelvic junction stone and moderately severe right-sided hydronephrosis. Tr. 573–81.

In April 2007, Dr. Peter O'Kelly performed right renal extracorporeal shock wave lithotripsy, right ureteroscopy, holmium laser lithotripsy, stone basket extraction and double J stent placement for right renal and right urethral stones. Tr. 600–03, 611–14.

On March 8, 2007, Plaintiff began care at First Choice Health Care with Dr. George A. Bitting with complaints of lumbar pain. Plaintiff weighed 255 pounds, and Dr. Bitting noted that Plaintiff had lumbopelvic muscle spasms and bilateral paraspinal muscle spasms. Dr. Bitting diagnosed low back pain and facet syndrome, and he prescribed Oxycontin and Percocet. Tr. 605–07.

On April 10, 2007, Plaintiff began seeing Dr. Walter James Evans. Dr. Evans noted that Plaintiff weighed 253 pounds, and he walked slowly with a slight limp and a somewhat stooped posture because of pain. Dr. Evans also found that Plaintiff had a lot of muscle spasms in the cervical paraspinous musculature, and Plaintiff was unable to tandem toe or heel walk. Plaintiff also was unable to feel pinprick in the right leg except on the inner aspect of his leg, and Plaintiff had a dullness in the left leg to pinprick. Dr. Evans also stated that Plaintiff's reflexes were severely diminished in his lower extremities. Dr. Evans opined that Plaintiff had chronic pain secondary to lumbar disc disease due to trauma; headaches probably secondary to cervical and lumbar disease; history of closed head injury; and snoring, leg jerking, and hypersomnolence. Dr. Evans also gave Plaintiff a handicapped sticker for his vehicle at this visit. Dr. Evans refilled Plaintiff's prescriptions for OxyContin 40 milligrams and 20 milligrams to take each three times daily, Percocet 10/325 one every four to six hours; Flexeril 10 milligrams one

three times daily; and Motrin 200 milligrams four tablets three times daily. Dr. Evans also ordered several tests.

On April 23, 2007, Dr. Evans indicated that Plaintiff had a positive antinuclear antibody result. Plaintiff's diagnoses included chronic pain syndrome secondary to lumbar disc disease, ruled out arthritic component given the positive antinuclear antibody; headaches, probably muscular; history of closed head injury; and snoring, leg jerking, and daytime drowsiness. Tr. 615–22.

On May 23, 2007, Plaintiff returned to Dr. Evans, who indicated that Plaintiff had a polysomnogram consistent with obstructive sleep apnea and mild restless leg syndrome, and Plaintiff was reporting some improvement with C-PAP titration. Plaintiff's blood pressure was 140/91 and his weight was 256 pounds. Dr. Evans stated that the nerve conduction study he performed on May 2, 2007, showed mild right median neuropathy. The bone scan performed by Dr. Evans on May 2, 2007, showed osteoarthritis with increased perfusion in the wrists, elbows, shoulders, hips, knees and ankles. There was also asymmetrical flow in the kidneys, suggestive of slow flow in the right kidney, indicative of a kidney stone. Dr. Evans's impression was chronic pain syndrome due to lumbar disc disease and osteoarthritis, muscular headaches, closed head injury, and obstructive sleep apnea with mild restless leg syndrome. Dr. Evans also noted that he would consider increasing Plaintiff's OxyContin dosage to 80 milligrams at his next refill. Tr. 639–40.

### 3. Medical Evidence After the ALJ's Decision

On August 23, 2007, Dr. Evans completed a Physical Capacities Evaluation on Plaintiff, in which Dr. Evans opined that Plaintiff could rarely lift 10 to 20 pounds; could occasionally lift five to ten pounds; could sit 1 to 2 hours in an 8 hour day; could stand and walk 0 to 1 hours in an 8 hour day; and should avoid dust, fumes, gases, extremes of temperature, humidity, and other environmental pollutants. Dr. Evans further felt that Plaintiff could rarely perform pushing or pulling movements (arm and/or leg controls); never climb stairs or ladders and balance; occasionally perform gross manipulation such as grasping, twisting, and handling; frequently could perform fine manipulation or finger dexterity; never do bending and/or stooping movements; rarely reach including overhead; occasionally operate motor vehicles; and never work with or around hazardous machinery. Dr. Evans stated that Plaintiff would miss more than four days per month from work as a result of his impairments or treatment. Dr. Evans based his restrictions on abnormalities noted on studies, including the bone scan, EMG, and MRI of the lumbar spine. Tr. 641.

On August 23, 2007, Dr. Evans also completed a Clinical Assessment of Pain in which he opined that Plaintiff's pain was present and to such an extent as to be distracting to adequate performance of daily activities or work; physical activity such as standing, walking, sitting, bending, stooping, and moving of extremities would greatly increase Plaintiff's pain to such a degree as to cause distraction from tasks or total abandonment of

task; and side effects of Plaintiff's medications could be expected to be severe and to limit effectiveness due to distraction, inattention, and drowsiness. Tr. 642.

On October 12, 2007, Dr. Evans completed a second Physical Capacities Evaluation in which he indicated that Plaintiff could occasionally lift one to five pounds; could sit one to two hours in an 8 hour day; could stand or walk one to two hours in an 8 hour day; and would need to avoid dust, gases, extremes of temperature, fumes, humidity, and other environmental pollutants. Dr. Evans also opined that Plaintiff could never perform pushing or pulling movements with arm and/or leg controls; never perform climbing of stairs or ladders and balancing; could rarely perform gross manipulation (grasping, twisting, and handling); could occasionally perform fine manipulation (finger dexterity); could never do bending/stooping movements; could never reach including overhead; could rarely operate motor vehicles; could never work with or around hazardous machinery. Dr. Evans felt that Plaintiff would miss more than four days monthly due to his impairments or treatment for his impairments. Tr. 16.

On October 12, 2007, Dr. Evans also completed a second Clinical Assessment of Pain in which he indicated that Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work; physical activity such as walking, standing, sitting, bending, stooping, moving of extremities, etc., would increase Plaintiff's pain to such an extent that bed rest and/or medication is necessary; and drug side effects of prescription medication can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc. Tr. 17.

II.     Discussion

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Plaintiff was not disabled because the ALJ failed in the following respects:

1.     that the ALJ erred in determining Plaintiff's RFC by (1) discounting Plaintiff's treating physicians Dr. Parker and Dr. Evans, (2) not considering the impact of all of Plaintiff's impairments, including his obesity, on his ability to work, (3) finding not entirely credible Plaintiff's statements concerning his symptoms, (4) not assessing the impact of the side effects of Plaintiff's medications; and

2.     that the ALJ erred at Step Five by posing defective hypotheticals to the VE.

The Commissioner disagrees, claiming the ALJ's denial of disability is supported by substantial record evidence and free of legal error.

A.     ALJ Findings

In his decision dated March 24, 2008, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2005.

2.     The claimant has not engaged in substantial gainful activity since December 7, 2000, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.     The claimant has the following severe impairments: residuals of a lumbosacral spine injury, residuals of a possible closed head injury with borderline intellectual functioning, and side effects of medications (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  The claimant has the residual functional capacity to perform light work except that he is restricted to simple routine tasks with no more than occasional interaction with the public or team type interaction with co-workers; no stooping, twisting, crouching, climbing, balancing, using foot pedals or controls with the right lower extremity, and being exposed to hazardous environments; and be allowed a sit/stand option at 60-minute intervals.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 7, 1972, and was 28 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (12/7/2000). He is currently 35 years old, also defined as a younger individual age 18–49 (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 7, 2000, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 20–36.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines "disability" as follows:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents her from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding

disability may be made at any step, no further inquiry is necessary.  20 C.F.R. §

404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not

disabled at a step," Commissioner makes determination and "do[es] not go on to the next

step.").

A claimant is not disabled within the meaning of the Act if he can return to past

relevant work as it is customarily performed in the economy or as the claimant actually

performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling

(SSR) 82-62 (1982).  The claimant bears the burden of establishing his inability to work

within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing

the inability to return to past relevant work, the burden shifts to the Commissioner to

come forward with evidence that claimant can perform alternative work and that such

work exists in the regional economy.  To satisfy that burden, the Commissioner may

obtain testimony from a VE demonstrating the existence of jobs available in the national

economy that claimant can perform despite the existence of impairments that prevent the

return to past relevant work.  *Id.*  If the Commissioner satisfies its burden, the claimant

must then establish that she is unable to perform other work. *Id.; see generally Bowen v.*

*Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final

decision of the Commissioner [] made after a hearing to which he was a party."  42

U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

1.    The ALJ Properly determined Plaintiff's RFC.

Plaintiff's first allegation of error is that the ALJ did not properly determine Plaintiff's RFC in being able to perform "light work."  Plaintiff argues that light work would require that Plaintiff be able to walk or stand a total of six hours in an eight hour day, and the record references that Plaintiff has difficulty standing, walking, or sitting for long periods of time. Plaintiff cites to Dr. Lamb's notation that Plaintiff would only be able to work in a position that would allow for him to have multiple position changes throughout the day with no more than an hour's time in any one position. Tr. 381. Plaintiff also cites to Dr. Evans's Physical Capacities Evaluations on August 23, 2007 and October 12, 2007 that limited Plaintiff to less than full time work because he would only be able to sit 1 to 2 hours daily and stand and walk 0 to 1 hours daily. Tr. 641, 16.[3] Plaintiff argues that the degree of limitation in these assessments would be inconsistent with light work and with any substantial gainful employment.

_____

[3] Dr. Evans's evaluations are found in the record, but they both post-date the ALJ's August 23, 2007 decision. The Appeals Council acknowledged receipt and review of the additional information and indicated it "found that this information does not provide a basis for changing the Administrate Law Judge's decision."  Tr.  6–10. In reviewing this matter, the court is mindful of *Harmon v. Apfel*, 103 F. Supp. 2d 869, 873 (D.S.C. 2000).  *Harmon* and other cases from this court have determined that, when "new and material" additional evidence that relates to the period before the ALJ's decision was issued is presented to the Appeals Council but the Appeals Council does not provide reasons the additional information did not change the ALJ's decision, remand was necessary so that appropriate review could take place.  Unlike those cases, however, Plaintiff did not raise this issue on appeal, and the court does not find it appropriate to analyze that issue sua sponte. The court notes that the record before the ALJ included medical records from Plaintiff's several visits to Dr. Evans in mid-2007.

Under 20 C.F.R. § 404.1567, "light work" mean that Plaintiff could lift no more than 20 pounds at a time and could frequently lift or carry objects weighing up to 10 pounds. A light work job requires a lot of walking or standing, and light jobs performed in the seated position often require the worker to operate hand or leg controls.

The Commissioner argues that based on the relevant evidence in the record, including medical evidence and Plaintiff's testimony, the ALJ correctly analyzed Plaintiff's physical abilities and found that he was physically capable of light work, reduced by certain non-exertional limitations. Tr. 26.

The regulations do not require that the ALJ accept an opinion from a treating physician when the physician opines on an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(e). Specifically as to opinions on a plaintiff's RFC, the regulations provide that the ALJ shall use treating physicians' opinions on the nature and severity of an impairment, including a plaintiff's RFC, or whether an impairment meets or equals the requirements of a listing, but "the final responsibility for deciding these issues is reserved to the Commissioner," and the ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(2) and (3).

Here, the ALJ considered the entire record when he assessed Plaintiff's RFC, and while he is not required to list every specific piece of evidence, *see* 20 C.F.R. §§ 404.1520, 404.1545, the ALJ stated that he considered all of the medical evidence of

record and gave legitimate reasons for the weight he gave to the physicians of record. The

ALJ noted that:

> [t]he weight of the evidence shows good flexibility and strength with no signs of muscle atrophy or neurological deficits in any particular dermatomal pattern. Diagnoses have included acute lumbar strain and bruising but do not document ongoing signs of a significant neurological disorder or radiculopathy. Neurosurgeon Dr. Santiago, and orthopedic surgeon, Dr. Chokshi, both opined that the claimant was not a surgical candidate. Nevertheless, in view of his history of lumbar injury attributed primarily to a bruise or strain, he should not be expected to lift or carry heavy weights greater than approximately 20 pounds occasionally. To relieve his allegations of discomfort, he should be allowed a sit/stand option every 60 minutes and he should not stoop, twist, crouch, climb, or balance. Additionally, he should not be required to use foot pedals or controls with his right lower extremity because of the occasional numbness. In view of his medications which sometimes include narcotics, he should not work in hazardous situations around unprotected heights or dangerous machinery.

Tr. 30.

The ALJ specifically cited to Dr. Parker's assessments and opinions, and noted

that although Dr. Parker's statements and assessments have changed slightly throughout

the record, that his findings are generally consistent with Dr. Parker's overall and most

recent assessment that Plaintiff could perform modified light work and had only an 8%

impairment rating of his lumbar spine.

After reviewing the record, the court finds that the ALJ's determination of

Plaintiff's RFC is not inconsistent with the medical evidence of record. Dr. Cain

completed an RFC assessment of Plaintiff in June 2004 (Tr. 425–32, 465–72 (duplicate)),

in which he opined that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds

frequently; sit, stand, or walk for six hours in an eight-hour day (Tr. 426, 466 (duplicate)).

Dr. Cain limited Plaintiff to occasional postural activities (Tr. 427, 467 (duplicate)) and based his opinion, at least in part, on a June 2004 consultative examination, but noted that the opinion in the consultative examination that Plaintiff would need to alternate positions every hour to be able to perform gainful employment was reserved to the Commissioner (Tr. 426, 431, 466 (duplicate), 471 (duplicate)).

In July 2005, Dr. Stinson completed a RFC assessment of Plaintiff (Tr. 453–60), in which he opined that he could lift and carry 20 pounds occasionally, 10 pounds frequently; sit, stand, or walk for six hours in an eight-hour day; but limited Plaintiff's ability to push or pull with his lower extremities (no foot controls) due to lumbar radiculopathy (Tr. 454). Similar to Dr. Cain, Dr. Stinson limited Plaintiff to occasional postural activities, except she restricted Plaintiff to never climb ladders, ropes, or scaffolds. Tr. 455.

Further, the psychological assessments in the record showed no significant limitations (e.g., Dr. Gorod's assessment in July 2004 and Dr. Williams' assessment in December 2005) and indicate that Plaintiff was not significantly limited in most mental abilities and only moderately limited in his abilities to complete a normal workday or work week without interruption. Tr. 473–74, 448–49.

The ALJ's RFC assessment is also consistent with the State agency physicians, objective medical evidence, and other record evidence. The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJ met his statutory and

regulatory obligation to assess all of the evidence in the record. This court may not reweigh the evidence or substitute its own judgment for the Commissioner's, even if it finds the evidence is susceptible to more than one rational interpretation. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). For the foregoing reasons, the court finds that substantial evidence supports the ALJ's conclusion that Plaintiff retained the RFC to perform a range of light work.

(1)   The ALJ Properly Considered and Discounted the Opinion of Plaintiff's Treating Physician Dr. Parker.

Plaintiff's next allegation of error concerns the ALJ's consideration of his physical impairments and complains that the ALJ improperly discounted the opinion of his treating physician Dr. Parker. Pl.'s Br. 21–25. The Commissioner defends the ALJ's decision by arguing that it was consistent with Dr. Parker's findings and to the extent that the ALJ discounted Dr. Parker's opinion, he did so appropriately in rejecting his vocational assessment of Plaintiff and opinion as to Plaintiff's disability, which opinion is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

SSR 96-2p provides that if a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" *See also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is

not supported by the clinical evidence or if it is inconsistent with other substantial evidence). When assessing a treating source's opinion, the ALJ shall consider the factors in 20 C.F.R. §§ 404.1527(d)(2) through (d)(6). However, determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance").

The Fourth Circuit has set forth the following considerations for an ALJ when weighing and evaluating medical opinions: "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001)). An ALJ, though, can give a treating physician's opinion less weight "in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178. Further, in undertaking review of the ALJ's treatment of Plaintiff's treating physician, the court remains mindful that its review is focused on whether the ALJ's opinion is supported by substantial evidence and that its role is not to "undertake to

re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589.

In Dr. Parker's notes on July 12, 2001, he stated "At this particular time, however, he is not able to perform work to any degree at all secondary to his pain complaints and lack of sleep. . . . I think that it is definitely safe to say that he be disabled from six months to a year regarding this particular situation." Tr. 414. On November 24, 2001, Dr. Parker indicated that he felt that Plaintiff's prognosis was poor, that Plaintiff was an individual with a disability, and that he was disabled from his job. Dr. Parker further opined that Plaintiff probably would test in the sedentary work category and would need frequent position changes if this could be allowed at his place of employment. Dr. Parker was pessimistic regarding improvement of Plaintiff's condition. Tr. 406–11. On September 12, 2002, Dr. Parker concluded that Plaintiff would be unable "to perform his former duties and this raises the question as to whether he is disabled permanently from any job. This question can be best answered by Vocational Rehabilitation evaluation and at such time if they determine he is unable to sustain gainful employment then this should be the determination and I would certainly concur with this." Tr. 401–04.

When Plaintiff saw Dr. Parker on January 30, 2003, Dr. Parker indicated that he could only provide Plaintiff with pain management. Dr. Parker noted that Plaintiff had obtained a McLeod Work Recovery Center FC Report dated October 28, 2002, which ranked Plaintiff as modified light work. Dr. Parker noted "[t]his did not meet the requirements of his present job as a carpenter, which is rated as very heavy work." Dr.

Parker requested an FCE evaluation of Plaintiff by Vocational Rehabilitation, if available. Tr. 400.

Plaintiff argues that the description of Dr. Parker's testing and notes reflect that he "had serious reservations regarding Plaintiff's ability to return to any type of work," and that the Commissioner failed to comply with 20 C.F.R. §404.1527 in not according adequate weight to Dr. Parker's opinion as Plaintiff's treating physician. Plaintiff also argues that the Commissioner did not consider the various factors set forth in 20 C.F.R. §404.1527(d) in evaluating the opinion of the treating physicians.

Further, Plaintiff argues that the court should reject the Commissioner's claim that Dr. Parker's opinion is consistent with the overall record, (Tr. 34), because he alleges the overall record shows his persistent attempts to gain pain relief, and references by other physicians as to the severity of his pain, including references by Dr. Lamb and Dr. Dickinson. Plaintiff argues that the overall record supports that he would be unable to perform light work or any other substantial gainful activity because he is unable to work an eight-hour day. *See* SSR 96-8p (RFC assessments consider plaintiff's maximum remaining ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, defined as eight hours per day, for five days a week, or an equivalent work schedule).

The undersigned finds no error in the ALJ's treatment of Dr. Parker's findings. The ALJ did what statutory and regulatory law require that he do—examine the findings and explain why he discounted those findings. The medical records do not establish that Plaintiff's impairments prevented him from performing light work with the restrictions

the ALJ outlined in Finding number 5.  Although Plaintiff did seek medical treatment for complaints about pain in his lower back radiating to his right leg, the objective examinations showed limited support for his subjective complaints.  The physicians' diagnoses have included acute lumbar strain and bruising,  but do not document ongoing signs of a significant neurological disorder or radiculopathy, despite repeated years of testing .  Objective medical tests performed from December 2000 through the date of the ALJ's decision showed very mild narrowing at the L5-S1 vertebral level, slightly eccentric to the left.  Tr. 223, 226, 298, 300, 383, 409, 547, 599. The objective medical tests did not explain Plaintiff's symptoms, and Dr. Parker (Tr. 415), Dr. Santiago (Tr. 541–45), and Dr. Chokshi (Tr. 223, 401, 409, 412–13) recommended against surgery. Plaintiff underwent EMG and nerve conduction studies in April 2001 and July 2002 and May 2007. Tr. 619. The May 2007 EMG and nerve conduction studies showed no significant abnormalities Tr. 619.   Clinical examinations showed, at worst, slightly decreased range of motion. Tr. 417, 542, 548, 617. At a March 2001 examination with Dr. Parker, Plaintiff had a negative Ober test (an examination for tightness in the muscle that flexes and rotates the thigh), negative straight leg raise (a test that evaluates disk herniation), and negative FABER (Flexion Abduction External Rotation) test (an examination for hip arthritis). Tr. 408, 410, 417. Likewise, test results during a December 2005 examination were normal.  Tr. 422.

Overall, diagnostic studies and clinical examinations show few abnormalities and the abnormalities shown do not coincide with claimant's subjective complaints. Tr. 223, 227, 401, 409, 412–13. Examination notes generally describe Plaintiff in no acute or

severe distress. Tr. 417, 542, 548, 557, 561. He showed no disturbance of fine or gross dexterity; no atrophy; and gait and station ranged from normal to a slight limp. Tr. 408, 421–22, 617. Examinations showed no signs of weakness and normal muscle tone, and Plaintiff had the ability to heel toe walk, walk in tandem, and rise from a seated position unassisted. Tr. 408, 421–22. Plaintiff demonstrated good flexibility and strength with no signs of muscle atrophy or neurological deficits. Tr.422. The consensus among examining physicians was that Plaintiff's sensory complaints were not physiological and examinations did not show any obvious neurological deficits. Tr. 330, 381, 411, 408–18, 422–23.

Dr. Parker's opinions that Plaintiff could perform sedentary or light work are vocational opinions that are not entitled to weight. 18 20 C.F.R. §§ 404.1513, 404.1527(d); *see Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). "The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'" *Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (*citing Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

In this case, the ALJ properly considered Dr. Parker's opinions. Tr. 34. The ALJ did not err in concluding that Dr. Parker's opinion that Plaintiff was disabled was a legal conclusion and not entitled to special weight.  *Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005) (ALJ did not err in concluding opinions Plaintiff could not work were legal conclusions). Here, the ALJ appropriately did not give weight to Dr. Parker's opinion that Plaintiff would be "disabled" for six months to a year and that Plaintiff was

"disabled from his job." Tr. 34. The ALJ explained, "It is apparent that Dr. Parker's statement of disability does not refer to disability as it is defined in the Social Security Act and Regulations." Tr. 34. Dr. Parker's statements suggest that he opined Plaintiff was disabled because Plaintiff could not return to his past construction work. Tr. 34.  Even if Dr. Parker had opined Plaintiff was disabled under the Act, the ALJ properly discredited this opinion, as it an opinion reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).

However, the ALJ stated that the findings in the decision were "generally consistent with [Dr. Parker's] overall and most recent assessments that [Plaintiff ] could perform modified light work." Tr. 34. In November 2001, Dr. Parker opined that Plaintiff could engage in activities that did not include twisting or bending. Tr. 406. In January 2003, Dr. Parker reiterated that he assessed Plaintiff with only an 8% impairment rating and recommended that Plaintiff undergo vocational rehabilitation for gainful employment.  Tr. 400. At that time, Dr. Parker acknowledged the McLeod Work Recovery Center functional capacity report from October 2002, which ranked Plaintiff as being able to perform light work. Tr. 400. The functional capacity report is consistent with the ALJ's RFC determination that Plaintiff could perform a range of light work with a sit-stand option.

> (2)     The ALJ properly considered the impact of all of Plaintiff's impairments on his ability to work.

Plaintiff's next allegation is that the Commissioner failed to follow the "slight abnormality" standard which exists in SSR 96-3p in finding that his obesity was a non-

severe impairment. In addition, Plaintiff alleges the Commissioner failed to consider and designate the severity of Plaintiff's carpal tunnel syndrome, degenerative joint disease of his left knee, headaches, fatigue, osteoarthritis, and obstructive sleep apnea.

Under SSR 96-3p, an impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities." The Ruling also states that "an impairment that is not severe' must be a slight abnormality (or combination of slight abnormalities) that has no more than minimal effect on the ability to do basic work activities." Plaintiff argues that (1) his carpal tunnel syndrome would affect his ability to perform gross manipulation as would be required in jobs listed by the Vocational Expert; (2) his fatigue would also interfere with his ability to sustain throughout the day; (3) his obesity should have been considered in the context of his obstructive sleep apnea and fatigue and its effect on the level and intensity of his pain in his back or lower extremities, such as his left knee which has documented degenerative joint disease.

Plaintiff further argues that the Commissioner violated SSR 96-8p in failing to consider the impact of severe and non-severe impairments on Plaintiff's ability to work. SSR 96-8p requires that the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, severe and non-severe, when evaluating RFC. The Ruling further provides,

> While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations

due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

The Commissioner found that Plaintiff's obesity was a non-severe impairment. Tr. 32.

Nowhere in the physicians' treatment records or diagnoses is there anything more than a mention that Plaintiff is obese. There is no more specific notation of what limitations his obesity may cause. The ALJ stated the following with respect to Plaintiff's obesity:

> The claimant has been described in the treatment notes as "obese" based on a height of 5'11" with weight ranging from approximately 246 pounds to 260 pounds. The claimant has been advised on several occasions to lose weight; however, he has not been referred to a nutritionist or prescribed medication or surgical intervention for a weight problem. The claimant's weight has not risen significantly over a short period of time and is not shown to have caused significant organ damage or to have significantly aggravated or resulted in joint instability. The claimant does not exhibit other common complications of obesity such as uncontrolled hypertension, significantly reduced respiratory capacity, hypoxia, somnolence, skin disorders related to excessive weight, edema in the feet and ankles, cardiovascular problems, coronary artery disease, diabetes, or hyperlipidemia. His reported sleep apnea has responded well to use of a c-pap machine. There is no evidence of any functional limitations related to his obesity and I find that the claimant's obesity is not a severe impairment as defined in the regulations. Further, I find no evidence of complications or functional restrictions based on consideration of his obesity in combination with his other impairments.

Tr. 31–32.

Although he claims he is obese, Plaintiff does not point to any record evidence regarding any pertinent diagnosis of obesity or specific limitations his obesity causes. *See* Pl.'s Br. 26–27. This duty, however, does not extend to speculation; rather, it is the

claimant's burden to "furnish medical and other evidence that [the Commissioner] can use to reach conclusions about [the claimant's] medical impairment(s) and . . . its effect on [the claimant's] ability to work on a sustained basis." 20 C.F.R. § 404.1512(a). Plaintiff has not met his burden of demonstrating any impact of his obesity on his ability to work. SSR 02-1p makes clear that, it is not the mere presence of obesity that determines disability, rather it is the effect it has on a claimant's ability to function and perform work-related tasks.

Here, Plaintiff has proffered no evidence to show that obesity impacted his ability to perform such tasks or cause any of his claimed symptoms, leaving it to the ALJ to parse from the record. The Ruling on which Plaintiff relies prohibits such conjecture:

> [W]e will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, 67 Fed. Reg. at 57862.

The court finds no error in the ALJ's treatment of Plaintiff's obesity. The ALJ properly considered Plaintiff's obesity as appropriate under the regulatory framework and his decision is supported by substantial evidence.

The ALJ also acknowledged that in addition to degenerative disc disease, Plaintiff complained of headaches (for which he took over-the-counter medication) sinusitis, sleep apnea (for which he used a CPAP machine), fatigue, forgetfulness, left knee and shoulder "problems," and carpal tunnel syndrome. Tr. 27. The ALJ found these impairments to be non-severe.

The ALJ again acknowledged Plaintiff's additional complaints during his discussion of medical evidence, and he explained how the record did not document additional limitations as a result of the non-severe impairments. Tr. 30–31. For example, aside from some crepitus in the left knee, objective and clinical examination did not reveal abnormalities: there were no signs of joint instability, normal range of motion, and no abnormality of gait and stance attributed to knee problems. Tr. 30, 420–24, 606.

Plaintiff's left shoulder "problem" began when he moved a refrigerator and slipped while holding the refrigerator with his left shoulder. Tr. 30, 586. X-rays of his shoulder and elbow were entirely normal, as were clinical and neurological examinations of Plaintiff's upper left extremity. Tr. 586. Even if Plaintiff had injured his left shoulder in May 2006, the ALJ noted that the record does not document persistent problems. Tr. 30. At the 2007 hearing, Plaintiff did not remember that he had injured his left shoulder. Tr. 76. Plaintiff's representative agreed with the ALJ that any injury predated the impairments at issue, and the ALJ noted that at the time of the December 2000 injury, Plaintiff was working overhead. Tr. 77.

Likewise, Dr. Lamb's March 2005 examination of Plaintiff's right wrist showed normal flexion, extension, and deviation of the wrist. Tr. 554. Although Dr. Parker prescribed Plaintiff to wear a splint, the ALJ noted the record does not indicate whether Dr. Parker actually examined Plaintiff's wrist or relied on Plaintiff's subjective reports. Tr. 30. Also, the ALJ pointed out the record does not document evidence of ongoing clinical or diagnostic findings that would support carpal tunnel syndrome. Tr. 30.

The ALJ discussed each of Plaintiff's impairments in detail in his reported decision. Tr. 26–34. The ALJ then noted that "I have considered the entire record including clinical findings, results of diagnostic studies, medical opinions, the claimant's subjective allegations, and the combined effect of all the claimant's impairments and find that the residual functional capacity as set forth above is an accurate reflection of the claimant's residual functional capacity." Tr. 34.

The ALJ correctly considered these complaints as appropriate under the regulatory framework and that his decision is based on substantial evidence. The ALJ considered the impact of Plaintiff's impairments, as demonstrated by discussing Plaintiff's impairments, both severe and not severe, in the decision. After reviewing the record, the undersigned finds the ALJ's articulation was sufficient to demonstrate that he took into account all of Plaintiff's impairments, individually and in combination. "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Todd v. Astrue*, No. 2:07 CV 89, 2009 WL 4754133 *14 (N.D.W.Va. Dec. 4, 2009) (citing *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1991) (quoting *Gooch v. Secretary of H.H.S.*, 833 F.2d 589, 592 (6th Cir. 1987)).

(3)     The ALJ properly assessed Plaintiff's credibility.

Plaintiff next alleges that the Commissioner erred in failing to consider his persistent efforts to obtain pain relief enhanced his credibility under SSR 96-7p. SSR 96-7p states:

> In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow treatment once it is prescribed lends support to an individual's

allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

In this case, Plaintiff claims he has made persistent efforts to obtain pain relief, such as seeking treatment for the pain from numerous medical sources, following the prescribed treatment, agreeing to the increases in the dosages of his narcotic pain medications, trying various treatment options such as facet joint injections, different narcotics, and physical therapy, and going to referred specialists. He argues that these persistent efforts show he was credible in his allegations of severe pain. Pl.'s Br. 25.

The Commissioner disagrees and states the ALJ properly considered Plaintiff's subjective complaints of disabling symptoms and properly concluded that they were not entirely credible and that these complaints did not prevent him from working. Tr. 28–34.

The Fourth Circuit has established a two-step analysis for evaluating subjective complaints. The first step requires documentation by objective medical evidence of the presence of an underlying impairment which reasonably could be expected to cause the subjective complaints of the severity and persistence alleged. *See Craig*, 76 F.3d at 594–96; *Mickles v. Shalala*, 29 F.3d 918, 925–26 (4th Cir. 1994). The ALJ must consider the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints reported. *See Craig*, 76 F.3d at 594–96; *Mickles*, 29 F.3d at 925–26. "Although a claimant's allegations about her pain may not be

discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).

The objective medical evidence and other record evidence—including treatment notes and Plaintiff's daily activities—are inconsistent with Plaintiff's complaints of disabling pain. Tr. 223, 226, 543 (complaints not physiologically possible). Here, the objective medical evidence demonstrated mild degenerative disc disease and disc bulge (Tr. 223, 226, 298, 300, 383, 409, 543, 547, 599), and did not support Plaintiff's subjective allegations of pain. *See* 20 C.F.R. § 404.1529(a) (2002); *see also Mickles*, 29 F.3d at 923 (holding that allegations of pain, without more, are insufficient to find disability); *Parris v. Heckler,* 733 F.2d 324, 327 (4th Cir. 1984) (holding that subjective evidence of pain cannot take precedence over objective medical evidence or lack thereof). The clinical medical evidence demonstrated slightly decreased range of motion, at worst, and normal motor strength, normal sensation, a normal gait, and negative straight leg raising. Tr. 417, 542, 548, 557, 561, 617.

Clinical notes reveal that Plaintiff was treated conservatively and did not complain of back or leg pain when he was seen for other complaints. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (conservative treatment does not support claim of disability). Dr. Parker examined Plaintiff in January 2005 for an annual examination and noted that Plaintiff had "been doing fairly well." Tr. 394. Dr. Parker assessed Plaintiff with only an 8% impairment rating and recommended that he undergo a vocational rehabilitation evaluation for gainful employment. Tr. 400. Also the records show that

Plaintiff did not complain of back or leg pain when he was treated for other reasons (*see e.g.,* Tr. 330 (aches and fever, normal physical examination); Tr. 361 (Rocky Mountain Spotted Fever, normal physical examination); Tr. 368 (rectal bleeding, normal physical examination); Tr. 375 (right finger injury, no complaints of back or leg pain)). Also during the examinations unrelated to his back or legs, Plaintiff reported not taking any medication. *See, e.g.,* Tr. 375.

Plaintiff provided inconsistent statements to medical professionals. Immediately after the December 2000 accident, Plaintiff denied loss of consciousness. Tr. 492. However, he subsequently indicated he did not know whether he lost consciousness and the severity of the incident appeared to increase, stating that he was knocked unconscious. Tr. 28, 379, 411, 420, 541, 547. Several years later, he recalled that immediately after the December 2000 accident, he was knocked unconscious and experienced headache and vomiting. Tr. 616. He testified at the hearing that he was knocked unconscious. Tr. 54.

In January 2001, Plaintiff told Dr. Osenbach he was unable to stand and bear weight and walk (Tr. 226-27); however, Dr. Osenbach "actually observed [Plaintiff] walking with the walker when he was not aware as he was leaving the clinic." Tr. 227. Dr. Santiago reported that Plaintiff exhibited positive Waddell's sign, which indicates exaggeration of symptoms. Tr. 544. In February 2002, Plaintiff reported to the physician treating him for sinus pain that he did construction work. Tr. 277, 283. He reported to Dr. Parker in July 2003 that he was attempting to do work, even though it exacerbated his pain from time to time. Tr. 399.

The ALJ concluded, after reviewing the record, that Plaintiff "maintain[ed] a fairly active and varied lifestyle which [was] not representative of a significant restriction of activities or constriction of interests." Tr. 34. The ALJ cited Plaintiff's daily activities as another example that Plaintiff was not as limited as he alleged. Tr. 33. *See Mickles*, 29 F.3d at 921 (holding that claimant's complaints of pain were undermined by her ability to perform a wide variety of daily tasks). Plaintiff reported to Dr. Lamb that he could shop at Wal-Mart and push the buggy, that he performs all his activities of daily life independently. Tr. 380. Plaintiff reported to Dr. Parker that he fished, picked berries, shopped and performed light duties. Tr. 406. The record contains evidence during the relevant time period that Plaintiff was working: he was sunburned at work (Tr. 323); reported working construction (Tr. 226, 277); he injured his right third finger November 2003 when he dropped a welder on it when loading it into his truck (Tr. 375); in May 2006, he injured his left shoulder while lifting a refrigerator (Tr. 30, 586). The record also contains evidence Plaintiff engaged in recreational activities, such as fishing (hospital record reflects Plaintiff went for stitches to close cut on finger made by a pocket knife while fishing) (Tr. 289-94); (Tr. 406) (reports to Dr. Parker that he fished, picked berries, shopped and performed light duties); and (Tr. 257) (physical therapy notes reflect that Plaintiff "went fishing and caught 51 fish!"). The ALJ found Plaintiff's complaints of pain are undermined by his ability to perform a wide variety of daily tasks, engage in recreational activities, and work.

The Commissioner points to further evidence in the record that demonstrates Plaintiff's lack of credibility, specifically Plaintiff's report to Dr. Lamb in June 2004 that

he had been convicted of fraud after he set his mobile home on fire because he could not pay the bills on it. Tr. 379.

SSR 96-7p requires that, prior to considering Plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of his subjective complaints, including pain. *See* SSR 96-7p, 61 Fed. Reg. 34483-01, 34484-85; *see also* 20 C.F.R. § 404.1529(b); *Craig*, 76 F.3d at 591–96. The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of his testimony and the record as a whole. If he rejects a claimant's testimony about his pain or physical condition, the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (*quoting Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 61 Fed. Reg. at 34486.

The court also finds that, as part of his review of the record as a whole, the ALJ properly completed Step Two of the analysis SSR 96-7p sets out for considering whether a claimant's subjective complaints are credible. The ALJ determined that Plaintiff's claims regarding the extent of his pain and limitations are not credible in light of his activities, his prior work, and the hearing testimony. *See* SSR 96-7p, 61 Fed. Reg. at 34485 (requiring that ALJ "make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). Factors the ALJ is to consider include claimant's daily activities and use of pain medication or other treatments for subjective symptoms. *See id.,* 20 C.F.R. § 404.1529(c)(4).

The court finds that substantial evidence supports the ALJ's credibility determination. *See, e.g., Johnson v. Barnhart*, 434 F.3d at 658 (upholding ALJ's credibility determination that was partially based on claimant's "routine" daily activities including watching television, cleaning the house, caring for a pet, and managing household finances).

The court finds the ALJ's thorough review of the record as a whole, including his articulated reasons for discounting Plaintiff's claims, supports a finding that the Commissioner's decision to deny benefits should be affirmed. *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (noting ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole).

The court finds the ALJ properly considered inconsistencies between Plaintiff's testimony and other evidence of record in evaluating the credibility of his subjective complaints. *See* 20 C.F.R. § 404.1529; *Hunter v. Sullivan,* 993 F.2d 31, 33 (4th Cir.

1992). The ALJ considered the entire record, including objective and subjective evidence, and adequately articulated his reasons for his credibility assessment in his decision.

> (4)     The ALJ properly assessed the impact of the side effects of Plaintiff's medications.

Plaintiff's next allegation is that although the Commissioner found that side effects of Plaintiff's medications were a severe impairment, he did not discuss how those side effects were used in arriving at Plaintiff's RFC. Plaintiff alternatively requests that the case be remanded for further consideration of Dr. Evans's opinions as to Plaintiff's limitations as stated in his clinical assessment (Tr. 642), claiming the ALJ did not address them in his decision. Dr. Evans's limitations concerned Plaintiff's distraction from his tasks and the side effects of his medications. *Id.*[4] Plaintiff argues that with the amount of narcotic medication his treating physicians prescribed to him, it would be reasonable to expect that he would experience significant side effects. SSR 96-7p requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms."

Under SSR 96-8p, the RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The Commissioner is also required under SSR 96-8p to include in his RFC assessment a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."

---

[4] Dr. Evans's assessments that were not before the ALJ. *See* n.3, *supra*.

Plaintiff argues that the Commissioner made no specific findings as to how the side effects of medications were considered in the RFC assessment, and that the case should be remanded for consideration of the side effects, particularly the detailed summary of those side effects as completed by Dr. Evans in his Clinical Assessments of Pain. Tr. 17, 642.

The Commissioner argues that even if the ALJ should have taken medication side-effects into consideration, any error is harmless. The record does not indicate that Plaintiff experienced side-effects from his medication. *See Brim v. Chater*, 74 F.3d 1230 (Table), 1996 WL 10288, *4 (4th Cir. 1996) (any errors or omissions regarding side-effects of medication do not sufficiently infect the ALJ decision to call for a remand and reconsideration when ALJ gave sufficient reasons, particularly daily activities, for refusing to fully credit all of Plaintiff's allegations of pain) (citing *Hatcher v. Secretary, HHS,* 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir. 1985); *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir. 1984)).

The record does not fully support the assumption that Plaintiff actually took the medications he received prescriptions for. As the ALJ summarized:

> At times, the claimant reports that he takes narcotic medications several times a day to alleviate his symptoms. At other times, he reported that he takes no medications or only over-the-counter medications. He reported that over-the-counter medications relieve his headaches. Of note is that during pain management in March and April 2007, the claimant reported that he was taking daily narcotics but blood work was negative for the narcotics. He was discharged from treatment with notations that he had shown inconsistent drug screens. On one occasion the claimant reported that a visitor to his home had stolen his Percocet. His doctor did not provide him with a replacement prescription.

Tr. 33.  At any rate, Plaintiff himself testified at the July 2007 hearing that he never had side-effects or problems with his medications and had no difficulty driving while taking his medication. Tr. 64–65. The court finds no error on this ground.

2.     The ALJ properly evaluated Step Five.

Plaintiff's last allegation is that the ALJ did not properly evaluate Step Five of the Sequential Evaluation Process after determining under Step IV that he could not return to his past relevant work. While the ALJ correctly requested the opinion of a Vocational Expert under Step V of the Sequential Evaluation process due to the presence of significant nonexertional limitations, Plaintiff argues that the hypotheticals the ALJ posed to the VE were defective.

Plaintiff argues that the VE was not given the opportunity to provide answers based upon all of Plaintiff's impairments of record, thereby rendering his testimony not valid.

At Step V, the Commissioner bears the burden of production to show that work exists in significant numbers in the national economy that Plaintiff could perform. *See* 20 C.F.R. §§ 404.1520, 404.1560(c)(2), 404.1566; *see, e.g., McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). Based on vocational expert testimony, the ALJ determined that work existed in significant numbers in the national economy that Plaintiff could perform, including as a small parts assembler, electrical assembler, and wire worker.  Tr. 35, Finding 10.

In his decision, the ALJ found Plaintiff's RFC "to perform light work except that he is restricted to simple routine tasks with no more than occasional interaction with the

public or team type interaction with co-workers; no stooping, twisting, crouching, climbing, balancing, using foot pedals or controls with the right lower extremity, and being exposed to hazardous environments; and be allowed a sit/stand option at 60-minute intervals." Tr. 26.

The first hypothetical question the ALJ asked of the VE follows:

[P]lease assume an individual the claimant's age, education and past relevant experiences. Limited to performing work with restriction that require no lifting or carrying over 20 pounds occasionally, 10 pounds frequently. The individual would require a one hour, 60 minute sit/stand option at the work station, sir. Other jobs should involve no stooping, twisting, crouching, or climbing. Also, of course, no balancing. No foot pedals, other controls with the right lower extremity. I think it would be reasonable to also add that avoidance of hazards, such as unprotected heights and just have him avoid dangerous machinery, machinery. We know he's driving with this load of narcotic medication. I don't know if I can explain that further. I wouldn't, wouldn't want him to operate dangerous machinery, sir. But just keep a reasonable distance away from the moving machinery like that.

Tr. 77.

The VE testified that such a hypothetical describes light work including as a general inspector, which including the sit/stand option include approximately 7,000 jobs in the South Carolina economy and some 490,000 nationwide. The VE also said such a person could work in the semiskilled SVP 3 category as a battery tester, of which there are approximately 1300 such jobs in South Carolina, and some 94,000 nationwide (not reduced by 50% for the sit/stand option). Tr. 78.

The ALJ then proposed hypothetical number two, which assumed the same restrictions of hypothetical number one, and added the following restrictions: simple, routine tasks, with only occasional required interaction with public or team type

interaction with coworkers. The VE responded that the additional restrictions would eliminate semiskilled work, but testified that they would allow for light unskilled work for the individual described in the hypothetical. Tr. 80. At the ALJ's request, the VE then listed some of the available jobs and their approximate numbers in the economy: handling occupations, assemblers, which including the sit/stand option would equate to 6,000 jobs as a small parts assembler, and approximately 420,000 nationwide, as well as an electrical assembler (1,100 jobs in South Carolina , 77,000 nationwide); and wire worker (650 jobs in South Carolina , 42,000 nationwide). *Id.* The VE testified that there is no conflict between the skill and exertional requirements of the individual jobs cited in those jobs and as described in the DOT. Tr. 81.

Plaintiff argues that the VE was not given an opportunity to provide answers based upon all of the Plaintiff's impairments," (Pl.'s Br. 28), and therefore the VE's testimony is invalid. In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence.

The court agrees with the Commissioner. In reviewing the record as a whole, the court finds the ALJ's hypothetical appropriately set out all of Plaintiff's impairments as supported by the medical record. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments). There is no error on this ground.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's mental and physical conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

August 9, 2010                                    Shiva V. Hodges
Florence, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**